Bruce L. MURRAY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7210.

Court of Appeals of Alaska.

Sept. 13, 2002.

Paul E. Malin, Assistant Public Defender, Barbara K. Brink, Public Defender, Rex Lamont Butler and Dan S. Bair, Rex Lamont Butler and Associates, Anchorage, for Appellant.

Marcelle K. McDannel, Assistant District Attorney, Susan A. Parkes, District Attor-

ney, W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

In 1998, Bruce L. Murray was convicted of second-degree weapons misconduct for knowingly possessing a firearm during the commission of a felony drug offense.[1] When this case was last before us, we remanded for the superior court to consider whether the State had proven a nexus between Murray's possession of a .44 magnum handgun and his commission of two felony drug offenses (possessing an ounce or more of marijuana with intent to distribute[2] and maintaining a building for keeping or distributing controlled substances[3]).

Murray argues that Superior Court Judge Larry D. Card erred in finding the required nexus on remand. He contends that Judge Card's decision rests on a clearly erroneous factual finding and that Judge Card applied an incorrect legal standard. We agree that the factual finding Murray attacks is clearly erroneous. We remand for reconsideration.

*Facts and proceedings*

In our previous decision, we discussed the facts of Murray's case at length.[4] On August 13, 1997, officers responded to Murray's hotel room looking for a dead body. Although the officers did not find a body, Murray told the officers that his girlfriend, Jeannie Joy, was in possession of cocaine and was driving around town in his Chevy Blazer. When the officers stopped Joy in the Blazer, they contacted Murray, and he consented to a search of the Blazer. During the search, the officers found marijuana and a crack pipe. Murray later arrived at the scene and told the officers that he had given Joy the marijuana to sell and that he had about a quarter

pound of marijuana and a handgun at his residence.

The officers obtained a search warrant for Murray's residence and found: (1) a bag containing 170.9 grams (approximately 6 ounces) of "bud" marijuana in a living room closet; (2) a gram scale and a screening tin (used to separate "bud" from "shake") in the kitchen; (3) marijuana residue in a bedroom drawer and on the screening tin; (4) a loaded .44 magnum handgun inside a fur-lined case in the bedside table drawer; and (5) a gun cleaning kit and boxes of ammunition in a bucket in the bedroom. The officers later found a marijuana "bud" in the handgun case.

Murray was tried in a bench trial before Judge Card. In ruling that Murray committed second-degree misconduct involving a weapon,[5] Judge Card noted:

> [A]t one time, a firearm anywhere near a quantity of drugs was sufficient. But the [Court] of Appeals [has] reversed that. And ... it appears that there should be at least some logical relevance. And in this case, the place where the drugs were located was also the place where the firearm was located. It's not like the firearm was here in Anchorage and the drugs were in Kenai or Denali or in the back of a car. And so there was a logical correlation, even though [Murray made] statements that there had been ... a burglary .... One['s] stash of marijuana is a valuable item, and people have been known to break into homes and places where they are kept; ... committing robberies, committing murders to get those drugs or ask[ing] for those or demanding those drugs and any money. So, the firearm was a necessary component.

Murray appealed on several grounds, and we remanded the case so that the trial court could enter specific findings on whether a nexus existed between Murray's possession

---

1. AS 11.61.195(a)(1).

2. *See* AS 11.71.040(a)(2), AS 11.71.190(b).

3. AS 11.71.040(a)(5).

4. *See Murray v. State,* 12 P.3d 784, 787–88 (Alaska App.2000).

5. AS 11.61.195(a)(1).

of the firearm and Murray's commission of the drug offenses.[6]

On remand, the superior court noted that its original factual findings were intended to address the nexus issue and incorporated its original findings into the remand order. The court also emphasized the following facts:

> The marijuana itself had been found in a closet of the same bedroom [as the gun] and Mr. Murray indicated that he had personally bought the gun to protect the home since the home had been burglarized.... [H]e was purchasing it by inference ... for the safety of his marijuana, his weighing materials, and the fact that he was effectively trying to keep safe his stash of marijuana.
>
> . . . .
>
> There's no question [that] the role of the handgun is not active in that he is not actively putting the gun into play by ... wearing it at the time he is conducting a drug transaction, but it's more passive in that it emboldens him to maintain his marijuana possession and the amount which he is possessing in his home. It helps make his home more secure to keep the marijuana in his possession....
>
> The substantial amount of drugs in this instant case as well as Mr. Murray's status as a felon leads the court to believe that the nexus requirement is met beyond a reasonable doubt
>
> . . .

*Discussion*

■ Before turning to the appropriate legal standard in this case, we address Murray's challenges to the superior court's factual findings on remand. We uphold a trial court's factual findings unless they are clearly erroneous.[7]

Murray first challenges the superior court's finding that both the marijuana and the firearm were located in the master bedroom. In its memorandum, the State concedes that the superior court "mistakenly mentioned that the drugs were found in Murray's bedroom closet, rather than in a living room closet." Having reviewed the trial record, we agree with the State's concession. Anchorage Police Officers Kevin Iverson and Steven Hebbe testified during the trial that they recovered the marijuana from the living room closet and that they recovered the gun from a bedside table drawer in the master bedroom. The trial court's finding that both the drugs and the firearm were located in the bedroom was clearly erroneous.[8] Because the proximity of the firearm to the drugs is relevant to the trial court's nexus finding, we remand for reconsideration of the nexus issue.

Murray also challenges the superior court's factual finding that Murray possessed approximately half a pound of marijuana instead of 170.9 grams. Although we do not believe this distinction affected the court's ultimate ruling on the nexus issue, we note for purposes of remand that the parties stipulated at trial that Murray possessed 170.9 grams, approximately six ounces, of marijuana.

Turning to the nexus issue, we believe the superior court also may have applied an incorrect legal standard in finding the nexus in this case. Alaska Statute 11.61.195(a)(1) provides that a person commits the crime of second-degree misconduct involving weapons if the person knowingly "possesses a firearm during the commission of [misconduct involving a controlled substance in the first-, second-, third-, or fourth-degree]." In *Collins v. State*,[9] we stated that AS 11.61.195(a)(1) "requires proof of a nexus between a defendant's possession of the firearm and the defendant's commission of the felony drug offense."[10] However, we did not define the exact contours of the required nexus.[11] To assist the court on remand, we will provide more explicit guidance.

---

**6.** *See Murray,* 12 P.3d at 794–95; *see also Collins v. State,* 977 P.2d 741, 753 (Alaska App.1999).

**7.** *Chilton v. State,* 611 P.2d 53, 55 (Alaska 1980).

**8.** *See id.*

**9.** 977 P.2d 741 (Alaska App.1999).

**10.** *Id.* at 748, 753.

**11.** *See id.* at 753.

In its brief, the State argues that there is always a sufficient nexus under AS 11.61.195(a)(1) when someone possesses drugs and a firearm in close physical proximity. Several state courts also have focused on the physical proximity of the drugs and the firearm in construing statutes similar to AS 11.61.195(a)(1). Some states assume a nexus between the firearm and the drugs if the offender was in actual possession of the firearm during the offense but require proof of a nexus if the offender only had constructive possession of the firearm during the offense.[12] Other states require that the defendant be in actual possession of the firearm during the commission of the offense as an additional requirement or a substitute to the nexus requirement.[13] For example, in *Gardner v. State*,[14] the Delaware Supreme Court held that the elements of possessing a firearm during the commission of a felony offense were not satisfied as a matter of law because the gun was found in the bedroom, the drugs were found in the basement and living room, and the State did not introduce any evidence that the drugs seized were ever in the bedroom or that the bedroom was ever the scene of drug trafficking.[15] Accordingly, the defendant did not actually possess the firearm "during the commission of a felony."[16]

■ In analyzing our nexus requirement, we note that a test based solely on physical proximity would allow convictions under AS 11.61.195(a)(1) of those who commit a drug offense in their residence and also possess in their residence a locked antique gun, an unloaded hunting rifle, or a firearm for the general protection of the residence. We do not believe this was the intent of the legislature. Instead, we believe that, in enacting

AS 11.61.195(a)(1), the legislature intended to penalize those who possess a firearm in furtherance of a drug offense. Accordingly, to establish the nexus that we required in *Collins*, the State must prove that the defendant's possession of the firearm aided, advanced, or furthered the commission of the drug offense. Possession of drugs and a firearm alone is insufficient for such a finding—even if the drugs and firearm were located in close physical proximity.

■ However, while the physical proximity of a firearm to drugs, with nothing more, is insufficient to support a nexus finding, the fact-finder may consider physical proximity when determining whether the State has proven that a firearm was possessed in furtherance of a drug offense. Federal circuit courts have identified the following factors as relevant in deciding whether a firearm was possessed in furtherance of a drug offense: (1) the type of drug activity conducted, (2) the accessibility of the firearm, (3) the type of firearm, (4) whether the firearm was stolen, (5) the status of the defendant's possession (legitimate or illegal), (6) whether the firearm was loaded, (7) the proximity of the firearm to drugs or drug profits, and (8) the time and circumstances under which the gun was found.[17] We agree that these factors might be relevant to a nexus determination under AS 11.61.195(a)(1). However, we caution courts not to apply them in a mechanical manner. We do not intend these factors as an exhaustive list, and we only recognize them as relevant to the extent that they show the defendant's possession of the firearm aided, advanced, or furthered the commission of the drug offense.

---

**12.** See *State v. Blanchard*, 776 So.2d 1165, 1173 (La.2001); *Commonwealth v. Montaque*, 23 S.W.3d 629, 632–33 (Ky.2000).

**13.** See *Barnett v. State*, 691 A.2d 614, 617–18 (Del.1997); *Mack v. State*, 312 A.2d 319, 322 (Del.1973); *State v. Smith*, 601 So.2d 263, 267 (Fla.Dist.Ct.App.1992); *State v. Garza*, 256 Neb. 752, 592 N.W.2d 485, 494 (1999).

**14.** 567 A.2d 404 (Del.1989).

**15.** *Id.* at 413–14.

**16.** *Id.;* Del.Code Ann. tit. 11, § 1447(a).

**17.** See *United States v. Timmons*, 283 F.3d 1246, 1253 (11th Cir.2002); *United States v. Wahl*, 290 F.3d 370, 376 (D.C.Cir.2002); *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir.2002); *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001); *United States v. Basham*, 268 F.3d 1199, 1206–08 (10th Cir.2001); *United States v. Ceballos–Torres*, 218 F.3d 409, 414–415 (5th Cir.2000); see also *State v. Blanchard*, 776 So.2d 1165, 1173 (La.2001) (listing similar factors as relevant to a nexus determination).

In his original findings, Judge Card concluded that the required nexus between the firearm and Murray's possession of the marijuana was established by the fact that the firearm and the drugs were located in the same house. But this, without more, is insufficient to establish the nexus.

█ In his findings on remand, Judge Card apparently relied on the mistaken assertion that the firearm and the marijuana were located in the same bedroom when he concluded that the presence of the firearm had "embolden[ed]" Murray to engage in felony marijuana possession. In fact, the marijuana was located in another part of the house. Moreover, Murray stated that he purchased the gun for his girlfriend so that *she* might be protected if there was a break-in. Murray's assertion was corroborated by police testimony that, even when Murray was actively looking for the gun so that he could turn it over to the officers, he looked in a bucket on the floor before locating the gun in the bedside table drawer. This evidence tends to undercut any conclusion that Murray possessed the weapon with the purpose of furthering his drug felony.

Many citizens of Alaska possess firearms to protect their homes. If the firearm in Murray's residence was purchased and used solely for home protection, then it would not have the required nexus to Murray's drug offense. In other words, the nexus is not proved simply because Murray's household possessions included drugs. To rule otherwise would be contrary to our conclusion in *Collins* that AS 11.61.195(a)(1) was not intended to punish a "cocaine user [who] also happens to be a gun owner." [18]

For these reasons, we vacate Judge Card's ruling and remand this case for reconsideration of the nexus issue.

*Conclusion*

The decision of the superior court on Murray's conviction for second-degree weapons misconduct is VACATED and the case is REMANDED for further consideration in light of this opinion. We retain jurisdiction of this case.

18. *Collins,* 977 P.2d at 748, 753.

203 Ariz. 357

**Herb ENCINAS, a married man, d/b/a Moon Valley Builders, Petitioner,**

**v.**

**The Honorable J. Kenneth MANGUM, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,**

**Aida C. Suarez, an unmarried person; Moses Shepard, an unmarried person, Real Parties in Interest.**

No. 1 CA–SA 01–0247.

Court of Appeals of Arizona, Division 1, Department E.

Jan. 17, 2002.

Reconsideration Denied Feb. 20, 2002.

Review Denied June 25, 2002.

Petitioner brought contract action against mother. The Superior Court, Maricopa County, No. CV 99-18701, J. Kenneth Mangum, J., ordered that non-lawyer son could ask questions and make arguments on behalf of mother. Petitioner challenged order by special action. The Court of Appeals, Lankford, J., held that trial court's order allowed an unauthorized person to practice law.

Jurisdiction accepted; relief granted.

**1. Appeal and Error** ⚖41(1)

Special action jurisdiction was appropriate to review trial court's interlocutory order allowing non-lawyer son to ask questions and make arguments on behalf of defendant mother in contract action, as issue was one of statewide importance, and petitioner had no remedy by way of appeal. 17B A.R.S. Special Actions Rules of Proc., Rule 1(a).

**2. Attorney and Client** ⚖11(2.1)

Trial court order permitting non-lawyer son to ask questions and make arguments in court on behalf of defendant mother in contract action allowed unauthorized practice of law, and thus exceeded trial court's jurisdic-

tion. 17A A.R.S. Sup.Ct.Rules, Rule 31(a), subd. 3.

**3. Attorney and Client** ⚖62

Non-lawyer son's actions in questioning and making arguments on behalf of defendant mother in contract action did not constitute self-representation, despite familial relationship and speculative interest as heir to mother's estate, where son was not a party.

**4. Attorney and Client** ⚖11(2.1)

Legal assistance of defendant mother by non-lawyer son was not justified in contract action by contention that mother spoke little English and suffered from partial hearing loss.

**5. Attorney and Client** ⚖11(2.1)
**Constitutional Law** ⚖305(2)

Refusal to allow non-lawyer son to provide legal representation to defendant mother in contract action did not violate mother's due process right to be heard; mother had right to represent herself or hire a lawyer. U.S.C.A. Const. Amend. 14.

———

The Eagleburger Law Group By Scot G. Teasdale, G. Gregory Eagleburger, Phoenix, Attorneys for Petitioner.

Aida C. Suarez and Moses Shepard, Phoenix, In Propria Persona.

## OPINION

LANKFORD, Judge.

¶ 1 In this special action, Petitioner Herb Encinas challenges the superior court's order allowing a non-lawyer to ask questions and make arguments on behalf of his mother. Petitioner contends this order improperly permits the unauthorized practice of law. By order, we previously accepted jurisdiction and granted relief, indicating that a decision would follow. Our decision holds that the order was improper because it is inconsistent with the supreme court's exercise of its exclusive jurisdiction over who may practice law in Arizona.

¶ 2 The underlying case is a contract action by Petitioner Encinas against Real Party in Interest Suarez. Real Party in Interest

Shepard is Suarez's son. He responded as self-professed "Counsel for Defendant" by filing an answer and a motion to dismiss.

¶ 3 The trial court struck these pleadings *sua sponte* because "Mr. Shepard is not admitted to practice law in Arizona and he gains no authority to act by virtue of being the Defendant's son." In a later minute entry, however, a newly assigned trial judge allowed "Mr. Shepard to participate as her assistant, to function as her attorney in fact, to ask questions, etc." The trial judge denied Petitioner's motion for reconsideration and clarified his earlier ruling, stating that "Mr. Shepard is not Ms. Suarez's attorney but may help her in asking questions and making arguments. He may not sign documents on her behalf. He may not claim attorneys fees or any other reimbursement that a *pro per* cannot claim." Petitioner then filed this special action.

[1]  ¶ 4 Special action jurisdiction is appropriate in this case. The issue is one of statewide importance. *See generally* Robert B. Van Wyck & Lynda C. Shely, *Unauthorized Practice of Law: Should We Just Give Up?*, 35 Ariz. Att'y 22 (Jan.1999). Petitioner also has no remedy by way of appeal from this interlocutory order. *See* Ariz. R.P. Spec. Act. 1(a).

¶ 5 The question presented is whether the court's order was improper in light of the supreme court's exercise of its exclusive jurisdiction over who may practice law in Arizona. *See In re Creasy*, 198 Ariz. 539, ¶ 7, 12 P.3d 214, 216 (2000) (discussing history of court's authority over the practice of law); *Hunt v. Maricopa County Emp. Merit Sys. Comm'n*, 127 Ariz. 259, 261–62, 619 P.2d 1036, 1038–39 (1980) (the supreme court's authority over the practice of law arises under article III of the Arizona Constitution). The supreme court has adopted Rule 31(a)(3), which limits the "privilege to practice" to active members of the State Bar. Ariz. R. Sup.Ct. 31(a)(3). Therefore, if the

trial court authorized Shepard—who is not a member of the bar—to practice law, the court exceeded its jurisdiction.

¶ 6 The supreme court has defined the practice of law as

> those acts, whether performed in court or in the law office, which lawyers customarily have carried out from day to day through the centuries.... Such acts include, but are not limited to, one person assisting or advising another in the preparation of documents or writings which affect, alter, or define legal rights; the direct or indirect giving of advice relative to legal rights or liabilities; the preparation for another of matters for courts, administrative agencies and other judicial and quasi-judicial bodies and officials as well as the acts of representation of another before such a body or officer. They also include rendering to another any other advice or services which are and have been customarily given and performed from day to day in the ordinary practice of members of the legal profession, either with or without compensation.

*State Bar of Ariz. v. Ariz. Land Title & Trust Co.*, 90 Ariz. 76, 95, 366 P.2d 1, 14 (1961).

[2]  ¶ 7 The superior court's order allowed Shepard to practice law as defined by our supreme court. It permits Shepard to ask questions and make arguments in court on behalf of Suarez.[1] This representation is the practice of law. We need not visit the "outer boundaries of the term" to conclude that this conduct constitutes the "practice of law." *Hackin v. State*, 102 Ariz. 218, 221, 427 P.2d 910, 913 (1967). "It cannot be disputed that one who represents another in court, be he an indigent or not, is, under our adversary process, going to the very core of the practice of law, a fact with which even the most uninformed persons are well aware." *Id.* The superior court erred by allowing an unauthorized person to practice law.[2]

---

1. For example, Shepard was permitted to address the court on Suarez's behalf at a Rule 16 pretrial conference. *See* Ariz. R. Civ. P. 16.

2. Moreover, by doing so, the order may place Petitioner's counsel at risk of unethical conduct

by "assisting" in the unauthorized practice of law. Supreme Court Rule 42, Ethical Rule 5.5(b) provides that a lawyer shall not "assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law." The Arizona State

[3] ¶8 The real parties in interest argue that Shepard's actions constitute permissible self-representation, *see Connor v. Cal–Az Prop., Inc.*, 137 Ariz. 53, 56, 668 P.2d 896, 899 (App.1983), because he has a future interest in his mother's property. This argument lacks merit. Shepard is not a party. Neither his familial relationship nor his speculative interest as a prospective heir entitles him to represent Suarez. *See Haberkorn v. Sears, Roebuck & Co.*, 5 Ariz.App. 397, 399, 427 P.2d 378, 380 (1967) (non-lawyer husband may not represent wife in a court of law, despite any community interest); *Bloch v. Bentfield*, 1 Ariz.App. 412, 417, 403 P.2d 559, 564 (1965) (non-lawyer plaintiff could represent self but not co-plaintiff family members).

[4] ¶9 They further argue that Suarez requires her son's assistance because she speaks little English and suffers from a partial hearing loss. First, these limitations do not require the *legal* assistance which the court authorized. *See Lisbon v. Merino*, No. 95CO67, 1997 WL 433530, at *3 (Ohio App. Jul. 30, 1997) (discussing trial judge's ethical duty to prevent the unauthorized practice of law and upholding a ruling forbidding defendant's husband to sit with, assist or advise her during a hearing). Second, these circumstances do not necessitate assistance from Shepard. A court interpreter has been appointed in this case. The hearing loss appears to be raised for the first time in this special action. We decline to address issues not raised in the trial court. *See Martin v. Super. Ct.*, 135 Ariz. 258, 261, 660 P.2d 859, 862 (1983). Moreover, the record indicates that Suarez has been able to respond during pretrial hearings, and the suggestion that Suarez suffers from hearing loss requiring assistance is thus not supported by the record before us.

[5] ¶10 Finally, the real parties in interest contend that the trial court's order must be upheld to ensure Suarez's due process right to be heard. We disagree. Suarez may represent herself. Suarez may hire a lawyer. The fact that she may not be able to afford a lawyer in this civil action does not violate due process. *See State ex rel. Corbin v. Hovatter*, 144 Ariz. 430, 431, 698 P.2d 225, 226 (App.1985) (an indigent's right to appointed counsel is recognized only where the litigant may lose his physical liberty if he loses the litigation (citing *Lassiter v. Dep't of Soc. Serv.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981))); *In re Kory L.*, 194 Ariz. 215, 217–18, 979 P.2d 543, 545–46 (App. 1999) (same).

¶11 The court's order exceeded its jurisdiction. Accordingly, we grant relief and vacate the order.

CONCURRING: JON W. THOMPSON, Presiding Judge, and DANIEL A. BARKER, Judge.

203 Ariz. 359

Barbara C. COLLETTE and Scott E. MacFarland, wife and husband; Holly L. Scofield, a single woman, Plaintiffs–Appellants,

v.

TOLLESON UNIFIED SCHOOL DISTRICT, NO. 214; Stephen Knight and Joyce Lee Knight, husband and wife; Kino Flores and Anna Flores, Defendants–Appellees.

No. 1 CA–CV 01–0490.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 12, 2002.

Injured motorists brought action against school district for injuries suffered in automobile accident with student who left school in violation of its modified closed-campus pol-

---

Bar Committee on Professional Conduct has concluded that a lawyer who negotiates or participates in arbitration with one engaged in the unauthorized practice of law violates Ethical Rule 5.5(b). Op. Ariz. State Bar I99–07. Participation in litigation is as problematic as participation in arbitration.

icy and caused accident. The Superior Court, Maricopa County, Nos. CV99-019845, CV99-020434, CV99-020524, Michael J. O'Melia, J., granted summary judgment in favor of school district, and motorists appealed. The Court of Appeals, Rayes, Judge Pro Tempore, in a matter of first impression, held that: (1) legal relationship between district and its student did not impose a duty upon the district to control student; (2) district's modified closed-campus policy was not a duty assumed for the protection of third persons; and (3) district was not liable to injured motorists based upon student lunch-hour time schedules.

Affirmed.

**1. Schools ☜89.8(1)**

Legal relationship between school district and its student did not impose a duty upon the district to control student, who left school in violation of its modified closed-campus policy and caused automobile accident; school district had no power to restrain student from leaving campus or to control student's operation of his motor vehicle, it only had power to impose discipline after student had violated the modified closed-campus policy, and injured motorists presented no evidence that a high school student who was off campus in violation of school rules posed an unreasonable risk of harm.

**2. Negligence ☜210, 1692**

A negligence action may not be maintained in the absence of a duty recognized by law, and the existence of a duty is a question of law for the court.

**3. Negligence ☜211, 214**

"Duty "is a concept that arises from the recognition that relations between individuals may impose upon one person a legal obligation for the benefit of another; it is an expression of the sum total of those policy considerations that lead the law to grant protection to a particular plaintiff from a particular defendant.

> See publication Words and Phrases for other judicial constructions and definitions.

**4. Negligence ☜210**

Courts will find a duty, in general, if reasonable persons would recognize it and agree that it exists.

**5. Negligence ☜214**

The relationship between individuals that results in a legal obligation is usually a direct one between the plaintiff and defendant.

**6. Negligence ☜213, 214**

There is no requirement that a foreseeable plaintiff be personally known to the defendant for a duty to exist.

**7. Negligence ☜220**

There is no common law duty to control the conduct of a third person so as to prevent harm from befalling another. Restatement (Second) of Torts § 314.

**8. Negligence ☜210, 212**

Knowledge of a risk of harm and the ability to take some action to ameliorate that risk do not alone impose a duty to act. Restatement (Second) of Torts § 314.

**9. Schools ☜89.8(1)**

School district's modified closed-campus policy was not a duty assumed for the protection of third persons, and thus, district was not liable to motorists who were injured by student who left school in violation of its modified closed-campus policy and caused automobile accident, where the district's duty in promulgating and enforcing a modified closed-campus policy for its students was not voluntarily assumed, but already existed.

**10. Schools ☜169**

High school students are not persons of dangerous propensities who are likely to cause bodily harm if not controlled.

**11. Schools ☜169**

Students are not the prisoners of the school; they are members of the community who regularly come and go among us in the activities of daily life.

**12. Schools ☜89.8(1)**

School district was not liable to motorists, who were injured in automobile accident by student who was allegedly hurrying back

to school from off-campus lunch, based upon student lunch-hour time schedules, even if such schedules were negligently imposed, because school had no duty to the injured motorists.

**13. Schools ⊂⊃89.8(1)**

Even if school owed duty to motorists who were injured in automobile accident with student who had left school in violation of its modified closed-campus policy, motorists failed to establish a breach of duty because student's sneaking off campus did not increase the ordinary risk of vehicular harm that motorists would have faced if student left campus with permission, and imposing a time limit on lunch, as done by virtually all schools and most employers, did not create an unreasonable risk of harm.

---

Shughart Thomson Kilroy Goodwin Raup, P.C. By Brian M. Goodwin, Rudolph J. Gerber, Lori V. Berke, Phoenix, Attorneys for Appellants Collette and MacFarland.

Herzog and O'Connor, P.C. By Mark O'Connor, Jody Buzicky, Scottsdale, Attorneys for Appellant Scofield.

Sanders & Parks, P.C. By Steven D. Leach, J. Steven Sparks, Michele L. Forney, Phoenix, Attorneys for Defendant–Appellees.

**OPINION**

RAYES, Judge Pro Tempore.*

¶ 1 This appeal stems from three consolidated actions. Barbara Collette and Scott MacFarland, wife and husband, and Holly L. Scofield ("appellants") appeal from the trial court's grant of summary judgment to defendants-appellees Tolleson Unified School District No. 214, Stephen Knight, and Kino Flores (collectively "the District").[1] For the reasons that follow, we affirm.

**STANDARD OF REVIEW**

¶ 2 Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Orme Sch. v. Reeves,* 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990). Our review of summary judgment is de novo. *Great Am. Mortgage, Inc. v. Statewide Ins. Co.,* 189 Ariz. 123, 125, 938 P.2d 1124, 1126 (App.1997). In conducting our review, we view the facts in the light most favorable to the party against whom summary judgment was entered. *Id.* at 124, 938 P.2d at 1125.

**FACTUAL AND PROCEDURAL HISTORY**

¶ 3 Appellants were injured in an automobile accident on November 19, 1998, at approximately 12:10 p.m., when the car Scofield was driving was struck by a car operated by Zachary Thomason, a student at Westview High School. Four other students were passengers in Thomason's car. The students were returning to school from Desert Sky Mall, about five miles away, where they had driven during their school lunch break. The scheduled lunch period for these students began at 11:20 a.m. and ended fifty minutes later at 12:10 p.m.

¶ 4 Westview had a modified closed-campus policy. That is, students were not to leave campus during the day without checking out and, in order to check out, needed specific parental permission. Students who violated the policy were subject to disciplinary action. Freshmen were not permitted to leave during school hours, including lunch; sophomores, juniors, and seniors with at least a 3.0 grade point average and their parents' permission were permitted to leave campus at lunch. An identification card or "lunch pass" was required to be presented by the students upon leaving and re-entering campus. The policy was intended to reward

---

* The Honorable Douglas L. Rayes, Judge Pro Tempore of the Court of Appeals, Division One, has been authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Arizona Constitution, Article 6, Section 31 and A.R.S. §§ 12–145 through 12–147 (1992 and Supp.2001).

1. Stephen Knight was the principal of Westview High School, a school within the District, and Kino Flores was the superintendent of the District.

students for academic achievement and good behavior.

¶ 5 Thomason did not have a lunch pass and neither did two other members of the group. After the students decided to drive to the mall for lunch, Thomason went to get his car, which was parked off campus. He proceeded to a campus entrance where a security guard was stationed. When the guard asked Thomason for his pass, he admitted he did not have one. As Thomason continued to walk on, the guard told him he could not leave. Thomason told the guard he needed some books from his car for his next class. The guard again told him he could not leave campus, and Thomason replied, "Well, I need the books, so, basically, I'm going off." The guard made no further attempt to stop Thomason, but did admonish him to come back quickly. The other members of the group left campus through an unguarded gate and joined Thomason, who drove to the mall.

¶ 6 The students ate lunch at the mall food court and then began the trip back to campus. The students gave conflicting testimony as to whether they were in a hurry to get back to class on time. Because we must view the record most favorably to appellants, we accept as true that Thomason was in a hurry. The accident happened while Thomason was driving westbound on Thomas Road when he pulled into the eastbound lane to pass other westbound vehicles. As he attempted to return to his lane of travel, he lost control of his vehicle, which then collided with Scofield's eastbound car. The investigating officer estimated Thomason's speed prior to impact was approximately seventy-two miles per hour.

¶ 7 The District sought summary judgment, alleging a lack of duty to appellants, and the trial court agreed. Appellants timely appealed.

## DISCUSSION

¶ 8 Appellants contend the trial court erred by granting summary judgment, and raise two arguments on appeal. First, they claim that the District, by virtue of its modified closed-campus policy, had a duty to protect the general public from the negligent driving of students who left campus. Second, they argue that the District created an unreasonable risk of harm to the motoring public by placing rigid time constraints on student lunch breaks. We first consider the duty issue.

### Determining the Existence of a Duty

[1–4] ¶ 9 A negligence action may not be maintained in the absence of a duty recognized by law, and the existence of a duty is a question of law for the court. *Markowitz v. Arizona Parks Bd.,* 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). "Duty" is a concept that arises from the recognition that relations between individuals may impose upon one person a legal obligation for the benefit of another. *Ontiveros v. Borak,* 136 Ariz. 500, 508, 667 P.2d 200, 208 (1983). It is an expression of the sum total of those policy considerations that lead the law to grant protection to a particular plaintiff from a particular defendant. *Id.* Courts will find a duty, in general, if reasonable persons would recognize it and agree that it exists. *Id.*

[5] ¶ 10 The relationship between individuals that results in a legal obligation is usually a direct one between the plaintiff and defendant. *Id.* In this case, appellants do not contend that they had any direct relationship with the District. They maintain, however, that the parties need not be connected or know each other for a duty to arise, citing *Rudolph v. Arizona B.A.S.S. Federation,* 182 Ariz. 622, 898 P.2d 1000 (App.1995).

[6] ¶ 11 This argument misconstrues *Rudolph.* Admittedly, there is no requirement that a foreseeable plaintiff be personally known to the defendant for a duty to exist. *Id.* at 624, 898 P.2d at 1002. For example, when one motorist negligently injures another on a public highway, liability is obviously not dependent upon whether they know each other. *Id.* at 625, 898 P.2d at 1003. Their relationship begins with their joint status as motorists, which places them within the foreseeable risk of negligent driving by other motorists. The general duty of reasonable care arises from this relationship and becomes fixed when it is breached and causes damage. The result is a direct relationship

between tortfeasor and injured victim. *Id.* *Rudolph* applied these concepts to find that the organizer of a fishing tournament had a duty to exercise reasonable care in designing and conducting the tournament so as not to injure other users of the lake. *Id.*

¶ 12 In this case, the District did not directly injure appellants; they were injured by Thomason, one of the District's students. We therefore must determine whether to recognize a legal relationship between appellants and the District that gives rise to a duty. Appellants contend that the District's special relationship with Thomason imposed a duty upon the District to control Thomason's conduct so as to prevent injury to them under the circumstances of this case.

[7, 8] ¶ 13 There is no common law duty to control the conduct of a third person so as to prevent harm from befalling another. Restatement (Second) of Torts ("Restatement") § 314 (1965); *Davis v. Mangelsdorf,* 138 Ariz. 207, 208, 673 P.2d 951, 952 (App.1983). Knowledge of a risk of harm and the ability to take some action to ameliorate that risk do not alone impose a duty to act. Restatement § 314; *see also Markowitz,* 146 Ariz. at 356, 706 P.2d at 368 (no consequences for negligence even in light of foreseeable risk if there is no duty).

¶ 14 Section 315 of the Restatement provides an exception to the general rule of nonliability when "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." Restatement § 315 (1965); *Cooke v. Berlin,* 153 Ariz. 220, 224, 735 P.2d 830, 834 (App.1987), *disapproved on*

*other grounds by Dunn v. Carruth,* 162 Ariz. 478, 481, 784 P.2d 684, 687 (1989).

¶ 15 Appellants do not argue that they had a special relationship with the District that gave them a right to the District's protection. Rather, their claim is predicated upon section 315(a) of the Restatement—the special relationship between the District and its *students.* Appellants ask us to find that relationship as one which imposed a duty upon the District to control Thomason and prevent him from harming them.[2] Appellants argue, and we agree, that a school district has a statutory and common law duty to its students.[3] While the standard of care that must be met to fulfill that duty has been the subject of several Arizona cases, no reported Arizona case has yet considered the question raised here.

¶ 16 The only conduct of the District at issue here is the alleged negligent enforcement of its modified closed-campus policy. Nothing happened to Thomason while at school that affected his ability to drive a car. Nor was Thomason's driving part of any school activity. *Cf. Bishop v. State Dep't of Corrections,* 172 Ariz. 472, 476, 837 P.2d 1207, 1211 (App.1992) (because school recruited students for youth conference, it thereby assumed a duty of care to them). The car Thomason was driving had not been provided to him by the District and the District had no reason to believe Thomason was an incompetent or dangerous driver. Thomason was driving on a public street with a valid driver's license for a personal purpose.

¶ 17 Plainly, the District had no power to control Thomason's actual operation of his vehicle. Appellants are really arguing that the District's duty to supervise its students

---

2. Appellants cite *Grimm v. Arizona Board of Pardons & Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977), for the proposition that a custodian must take affirmative measures to avoid increasing danger to third persons from the known conduct of persons under the custodian's control. *Grimm,* however, applied Restatement § 319 (1965) governing the duty of "those in charge of persons having dangerous propensities," that is, individuals likely to cause bodily harm to others if not controlled. *Id.* at 267, 564 P.2d at 1234. There is no evidence that Thomason had any dangerous propensities or that the District knew or should have known that he was likely to cause bodily harm if not controlled.

3. Arizona Revised Statutes ("A.R.S.") § 15–341(A)(13), (14), and (17) (Supp.2001) requires the governing board of the school district to hold students to strict account for disorderly conduct on school property; discipline students for disorderly conduct on the way to and from school; and provide for adequate supervision over pupils in instructional and noninstructional activities. The duty of ordinary care owed by a school district and teacher to students while under their charge is recognized in *Chavez v. Tolleson Elementary,* 122 Ariz. 472, 475, 595 P.2d 1017, 1020 (App.1979).

gave rise to a duty to appellants to keep Thomason from driving his car at the particular time this accident happened. We do not believe reasonable persons would agree that such a duty exists, and decline to impose such a duty in this case for both practical and policy reasons.

¶ 18 As a practical matter, we see no benefit in imposing a duty upon a school district concerning the conduct of students over which it has no control. The District has no power or authority to decide which students are authorized to operate motor vehicles on public highways. Nor does it have the power to prevent, revoke, or restrict a student's off-campus driving privileges, or even to prevent a student from choosing to drive without a license. The most the District can do is to impose discipline upon a student for the violation of school rules involving motor vehicles in and around campus or prohibit a student from driving a motor vehicle onto the school campus.

¶ 19 The ability to impose discipline after the fact is significantly different from the power to control a student's conduct before the fact.[4] Once a student removes himself from school grounds, with or without permission, his decision to drive is outside the supervisory power of school officials. This court has recognized, in another context involving the control of the conduct of a minor, the futility of imposing a duty when there is no concomitant power to discharge it. *Pfaff By and Through Stalcup v. Ilstrup*, 155 Ariz. 373, 373–74, 746 P.2d 1303, 1303–04 (App. 1987) (recognizing that a non-custodial parent living 120 miles away lacked power to control his child).

¶ 20 Moreover, appellants' argument proposes an unreasonable duty on schools with potentially broad ramifications. The duty of control that appellants seek to impose here— to prevent student driving at any time that a student is supposed to be in school—could, if recognized, encompass an even broader range of potential student conduct. School districts might thereby be called upon to

defend their student supervision policies and actions in a variety of other contexts and settings, and all other aspects of a school's schedule could be subject to challenge. We do not believe a school district should be under a duty to anticipate and protect against such eventualities.

¶ 21 The Arizona cases relied upon by appellants that address the liability of schools and school districts are inapposite because they are based upon the undisputed duty of care or supervision owed to a student. This court has twice held, in automobile accident cases, that a school or school district does not, as a matter of law, breach the duty of student supervision by failing to have, or to enforce, a closed campus policy. *Rogers By and Through Standley v. Retrum*, 170 Ariz. 399, 403, 825 P.2d 20, 24 (App.1991); *Tollenaar v. Chino Valley Sch. Dist.*, 190 Ariz. 179, 180, 945 P.2d 1310, 1311 (App. 1997). The basis for these decisions was that the students were not exposed to an unreasonable, or increased, risk of harm simply by driving during school hours as opposed to non-school hours.

¶ 22 Appellants' analogy to *Rudolph* is also misplaced. In that case, the organizer of a fishing tournament, as a user of the lake, was held to have a duty to design the tournament and make rules for the conduct of its members so as to avoid increasing the risk of harm to all other users of the lake. Here, the District was not a user of the highway. Thomason was not involved in any school activity in which the District made rules for use of the public highway which would affect other motorists such as appellants. Thomason's driving was governed by the general laws regulating the operation of a motor vehicle, which were in turn unaffected by any school rule.

¶ 23 Reported cases from other jurisdictions that have considered similar arguments for the imposition of a duty upon a school district for the negligence of a student driver have declined to find such a duty. In the first of these, *Thompson v. Ange*, 83 A.D.2d

---

4. For example, school officials are not authorized to physically restrain a high school student to prevent that student from leaving campus. A.R.S. § 15–843(b)(3) (Supp.2001) (physical

force by certificated or classified school personnel is permitted only in self-defense, defense of others, and defense of property).

193, 443 N.Y.S.2d 918, 920 (1981), the court refused to impose liability upon school authorities for the negligence of a licensed student driver while driving his own car on a public road. The student was traveling from his high school to a vocational training center, during school hours and in violation of school rules. *Id.* In finding no duty, the court noted that the violation of school rules did not increase the risk of an accident; indeed, the risk existed regardless of any school rule: "With or without rules, neither [the school board nor the district] has any duty to members of the driving public to keep their student ... off the public highways with his automobile during school hours." *Id.* at 921.

¶ 24 The Indiana Court of Appeals followed *Ange* in *Wickey v. Sparks,* 642 N.E.2d 262 (Ind.Ct.App.1994). *Wickey* also involved an automobile accident caused by a high school student. *Id.* at 264. After completing morning vocational classes, students were allowed to drive to the high school for afternoon classes if they had parental permission and a valid driver's license. *Id.* The student handbook required safe driving and compliance with all traffic laws. Students were required to return to school by a certain time and were instructed to use a route that was deemed "safer" by school officials. *Id.* at 264–65.

¶ 25 Finding no duty to the motorist injured by the student's driving, the Indiana court balanced three factors: the relationship of the parties, the reasonable foreseeability of harm, and public policy. *Id.* at 266–68. First, the court found no legal relationship between school authorities and the general public. *Id.* at 266. Second, there was no evidence that a student driving during school hours created the foreseeability of increased harm to the public any more than if that student, or any other licensed driver for that matter, had been driving on the public highway at any other time for any other reason.

*Id.* at 267. Finally, as a matter of public policy, the court did not believe that schools should be insurers of their students' conduct or be liable for students' negligent acts away from school. *Id.*

¶ 26 The California Supreme Court reached a similar result in *Hoff v. Vacaville Unified School District,* 19 Cal.4th 925, 80 Cal.Rptr.2d 811, 968 P.2d 522, 525 (1998), in which a pedestrian was struck by a student motorist when the student, who was exiting a high school parking lot, jumped the curb with his car. The pedestrian sued the school district and advanced the same argument as appellants, that the special relationship between the school district and the student imposed upon the district a duty to exercise reasonable care to control the student so as to protect all persons who were foreseeably endangered by his conduct. *Id.* 80 Cal. Rptr.2d 811, 968 P.2d at 527.

¶ 27 The California Supreme Court rejected the existence of such a broad duty, finding that the district's duty to supervise students did not run to the off-campus, non-student, pedestrian. *Id.* 80 Cal.Rptr.2d 811, 968 P.2d at 528–29. The court held that the relationship of the district to its student was analogous to that of a parent to a child. Thus, any duty school employees owed to off-campus students could not be greater than the duty the students' parents would owe to those same individuals, and there could be no liability when school personnel neither knew, nor reasonably should know, that a particular student had a tendency to drive recklessly. *Id.*[5]

¶ 28 The most recent court to consider this issue was *Gylten v. Swalboski,* 246 F.3d 1139 (8th Cir.2001) (applying Minnesota law). In *Gylten,* the student, a licensed driver, had been asked to drive himself and another member of the football team to practice at another school because the usual school bus transportation was not available. *Id.* at 1141. The student driver had an accident en route,

---

**5.** One justice specially concurred in the result to make clear that he would have ended the court's analysis with the determination that the school district's duty could not exceed a parent's duty. He would not have taken the additional step of establishing an analogy to the parent-child relationship because doing so might impose unwarranted liability in cases where district employees knew or should have known of a child's tendencies to behavior that might injure a non-student in these same circumstances. *Id.* For the same reasons of caution, we also decline to establish that analogy as law in this case.

and the injured motorist sued the school district. In affirming the district court's finding that no duty existed, the appeals court cited with approval the *Ange, Wickey,* and *Hoff* cases. *Id.* at 1143–44. As in those cases, the court found no special relationship between the district and the non-student plaintiff. There was no evidence the district knew or should have known that the student was anything but an average licensed driver with parental permission to drive to school. There was no evidence that he had a history of careless driving, and the district did not provide the vehicle. *Id.* at 1144.

¶ 29 In each of these four cases, the nexus between student driving and a school activity or educational function was even stronger than it is in this case. The no-duty decisions of these courts reflect the unwillingness as a matter of policy to extend a school district's responsibility to persons in the position of appellants. We agree with these decisions for the reasons discussed above, and we also find, as in *Ange,* that imposing a duty here would extend the legal consequences "beyond a controllable degree." 443 N.Y.S.2d at 921. *Accord Rodriguez v. Besser Co.,* 115 Ariz. 454, 460, 565 P.2d 1315, 1321 (App.1977) (recognizing that a determination as to duty involves a multitude of policy considerations and a finding of no duty means the burden of holding otherwise is too great).[6]

¶ 30 We also base our decision upon another requirement for the imposition of a duty that we find lacking here and that is a finding that Thomason posed an "unreasonable" risk of harm. *See Alhambra Sch. Dist. v. Superior Court (Nichols),* 165 Ariz. 38, 41, 796 P.2d 470, 473 (1990) (duty requires the

exercise of care for protection against *unreasonable* risks of harm). Here, appellants presented no evidence that a high school student who is off campus in violation of school rules poses an unreasonable risk of harm. We hold that the legal relationship between the District and its student Thomason did not impose a duty upon the District to control Thomason so as to prevent him from injuring appellants under the facts of this case.

## Assumption of Duty

[9] ¶ 31 Appellants also argue that the District's modified closed-campus policy was a duty assumed by the District for appellants' protection as described in Restatement § 324A (1965), which provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or third person upon the undertaking.

Appellants contend that the District "recognized that enforcement of its modified and supervised closed-campus policy was necessary for the protection of students and other motorists."[7] However, as discussed previ-

---

6. The extent of the potential burden which appellants seek to place upon the District is best illustrated by their own expert's view of the undertaking necessary for the District to meet the standard of care before it could set a simple lunch break policy: "undertake a comprehensive study of traffic conditions near and surrounding the campus to ascertain the impact of their modified closed campus policy on nearby traffic volumes and roadway capacities [and] . . . evaluate and study distances of actual student destinations during the lunch period."

7. Although we will accept for purposes of argument that the District did recognize this, we note that the record does not support so broad a

construction. Appellants cite the deposition testimony of a representative of the District to support their argument that the District knew its policy was intended to protect the public. The excerpt quotes an assistant principal to the effect that the school practices a "good neighbor policy" towards the neighboring community whereby it attempts to provide protection to the general public against certain risks. In the excerpt quoted by appellants, the assistant principal was addressing the school's concern for student conduct that might not be that of a "good neighbor;" she was not discussing student driving. Indeed, the assistant principal clearly recognized the impossibility of the District controlling off-campus conduct and repeatedly emphasized that the Dis-

ously, the District's "recognition" that enforcement of its student supervision policies also acted to protect the public is not, by itself, enough to impose a *duty* to act for the protection of the public. *Markowitz*, 146 Ariz. at 356, 706 P.2d at 368.

¶ 32 In any case, § 324A is inapplicable here. This section operates to create a duty from a voluntary undertaking by one who otherwise has no duty to act. *See Barnum v. Rural Fire Prot. Co.*, 24 Ariz.App. 233, 237, 537 P.2d 618, 622 (1975) (applying Restatement § 323, a related aspect of voluntary undertakings). The District's duty in promulgating and enforcing a modified closed-campus policy for its students was not voluntarily assumed, but already existing.

[10, 11] ¶ 33 In addition, because appellants do not argue that subsections (b) or (c) of § 324A apply in this case, a duty under § 324A could be found only if the District's failure to exercise reasonable care to keep students confined to campus at specific times increased the risk of harm from their conduct. Appellants' argument is tantamount to asking us to find that a high school student, when not at school and under the school's supervision, poses an increased risk of harm to the community as a matter of law. We see no basis for such a determination. High school students are not persons of "dangerous propensities" who are "likely to cause bodily harm" if not controlled. There is no evidence that students who sometimes break attendance rules are a danger to the public. Students are not the prisoners of the school; they are members of the community who regularly come and go among us in the activities of daily life.

¶ 34 Moreover, no necessary connection has been established here between a student who leaves campus in violation of the rules and negligent driving. No evidence was presented that a student who leaves *with* permission is less likely to be involved in an automobile accident than one who does not. Many students drive to and from school, to and from jobs, for errands, and for pleasure.

In so doing, they expose themselves and others to the risk of motor vehicle accidents, and it cannot be said as a matter of law that student driving is qualitatively more risky during a daytime school lunch break than at any other time a student driver might be on the road. We are unwilling to hold that students outside the reach of school supervision pose an increased risk of harm to the general public.

## "Rush Hour" Mentality

[12] ¶ 35 Appellants contend that the District's "rigid time limit" for lunch created a "rush-hour" mentality for student drivers. They claim that the District should have known that students were regularly driving to Desert Sky Mall for lunch and that not enough time was allocated for them to make such a trip safely. They further contend that the time schedule issue makes this case similar to *Bishop* and *Rudolph*.

¶ 36 Again, we disagree. The time schedules in both *Bishop* and *Rudolph* were relevant to whether a duty had been breached, not whether one existed. Because we hold that the District had no duty to appellants, the District cannot be liable to them based upon student lunch-hour time schedules, even if such schedules might be "negligently" imposed. *Markowitz*, 146 Ariz. at 356, 706 P.2d at 368.

## No Breach of Duty

[13] ¶ 37 Even if this court accepted appellants' argument that the District owed them a duty, summary judgment would nonetheless be appropriate. The evidence viewed most favorably to appellants fails to establish a breach of duty. Thomason's sneaking off campus did not increase the ordinary risk of vehicular harm that appellants would have faced if Thomason left campus with permission. Imposing a time limit on lunch, as done by virtually all schools and most employers, did not create an unreasonable risk of harm.[8] This case is indistinguishable from *Rogers* and *Tollenaar*. Here, as in those

---

trict's policy was to discipline only that conduct which affected the entire student body.

8. As discussed above in note 6, the burden appellants would have us impose on the District in determining the length of the lunch break is not reasonable.

cases, appellants were exposed only to the ordinary risks of vehicular collision that "members of our mobile society face … whenever they are in cars." *Rogers,* 170 Ariz. at 403, 825 P.2d at 24.

## CONCLUSION

¶ 38 The judgment of the trial court is affirmed.

CONCURRING: WILLIAM F. GARBARINO, Presiding Judge and EDWARD C. VOSS, Judge.

